**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Michael Rubin and<br>Michael Rubin Associates, L.L.C.,<br><br>                      Plaintiffs,<br><br>v.<br><br>Sona International Corporation; Sona<br>Laser Centers, Inc.; James H. Amos, Jr.;<br>Heather Rose; Thomas R. Noon; Dennis<br>R. Jones; Cookie Jones; and Carousel<br>Capital, Inc.,<br><br>                  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **COMPLAINT AND**<br>    **JURY DEMAND** |

Plaintiffs, Michael Rubin and Michael Rubin Associates, L.L.C., by their attorneys Boies Schiller & Flexner LLP and Dady & Garner, P.A., for their complaint against Defendants, allege as follows:

## NATURE OF ACTION

1.     Plaintiff Michael Rubin Associates, L.L.C., a franchisee of Sona Laser Centers, Inc. ("SLC"), and its owner, Michael Rubin, bring this action to recover damages, costs and attorneys' fees on account of Defendants' fraudulent sale of laser-based cosmetic treatment franchises for hair removal and skin rejuvenation, breach of contract and violation of the New York State Franchise Sales Act.

2.      Defendants, Sona International Corporation ("SIC"), Sona Laser Centers, Inc. ("SLC"), Dennis and Cookie Jones (the "Joneses") and Thomas Noon ("Noon") (collectively, the "Jones Defendants"), purporting to capitalize upon advances in laser technology and the immense and growing market for procedures to enhance personal appearance, represented to Plaintiffs that they had a proven, proprietary, patent-pending system for permanent removal of 97 percent of all types and colors of unwanted hair that was fast and cost-effective; SLC used lasers that were the most powerful available, and that were manufactured especially and exclusively for it; that franchisees earned a 55% margin after a break-even of $50,000 in monthly sales; and that because of SLC's proprietary treatment systems, products and technology, Sona franchisees had a substantial advantage over all competitors.  The Jones Defendants further told Plaintiffs that they would furnish Rubin with hundreds of thousands of dollars in tested and proven advertising materials that would catapult his franchise to market dominance; that they would continue to produce hundreds of thousands of dollars in additional advertising materials each year without additional charge; that they had "world class customized software applications" that would ensure the smooth operation of the franchisee's businesses; that they had the most up-to-date, cutting-edge laser technology selected by their medical director after extensive and comprehensive testing; and that franchisees would receive ongoing support and advice; Defendants told Rubin that the cost to build a Sona Laser Center was about $100,000 and that he would need space of 5,000 square feet.  In April 2004, James H. Amos, Carousel Capital, Inc. and Heather Rose took over SLC and SIC (the "Amos Defendants") and told Rubin and other franchisees that they were going to build the Sona franchise

system aggressively, make "Sona" a household word and eventually make SLC a public company.  In reliance on these and other representations, Rubin invested nearly a million dollars to acquire the rights to Sona Laser Centers in the State of Connecticut and to open its first Sona Laser Center in New Haven, Connecticut.  After opening this first center, Rubin discovered that the Defendants had misrepresented virtually every aspect of the business:  SLC's pending patent was for only a very narrow aspect of laser treatments with no long-term value as intellectual property; SLC's "proprietary" hair removal process was in fact based on a longstanding (1986) publicly available clinical study taught in electrology schools for almost two decades; it could not treat all hair colors or hair types effectively; it could not remove 97 percent of hair in an average of five treatments; SLC had not conducted a comprehensive, documented or properly administered review of available laser technology; it had not properly disclosed that its laser supplier held an ownership stake in the franchisor; and no current Sona Laser Centers in operation had achieved the financial performance represented by the Defendants.  Plaintiff's center cost it over $250,000, and the space of 5,000 square feet was far in excess of what was required.  The system was not proven – in fact company-owned stores were losing money or, at best, breaking even at the time Defendants were telling the franchisees that they were successful; laser treatment centers did not achieve profitability at a $50,000 break-even level, but in fact generated immense liabilities; the advertising materials provided to franchisees were in fact unusable due to amateur quality of design; the software provided and installed by SLC not only was inadequate but also crashed and destroyed all of Rubin's records; the advertising materials, sales scripts and training materials provided by Sona included false claims regarding the

efficacy of its treatment processes; and the laser technology selected by Sona was not reliable for the purposes of a high volume laser hair removal business.  In addition, Defendants failed to provide the training, technical, operational and promotional support that they had agreed to provide.  When these problems began to surface, Defendants, specifically including individual Defendants Amos and Rose, sought to deflect Rubin from his complaints, indicating publicly that they had full confidence in the Sona model, knew exactly what they were offering, and that any underperformance of a Sona location was solely a function of Rubin's operation.  In mid-2004, SLC, under Amos's decision, launched a new franchise – "Sona MedSpas" – that was to replace "Sona Laser Centers" and offered, in addition to hair removal, skin rejuvenation.  Amos and Rose told Rubin that it had to sign a new agreement for Sona MedSpas, with higher fees and more onerous terms – including a doubling of capital requirements – in order to benefit from newer, more effective laser technology, and in order to establish the additional centers necessary to maintain its territorial rights.  Rubin expressed doubts about the lawfulness of this franchise offering and the viability of the new "Med Spa" concept, but Amos and Rose assured him that the Sona Med Spa model was sound, that franchisees who expressed doubts about Sona were misinformed and that the Med Spa franchise offering was entirely lawful.  In reliance on there representations, Rubin and MRA executed a franchise agreement for a Sona Med Spa that purported to replace his earlier agreement and that combined higher fees and costs and fewer benefits than the earlier agreement.  In fact, the franchise offering for Sona Med Spa was unregistered and unlawful, and simply perpetuated and confirmed the

misrepresentations made earlier.  As a result of Defendants' wrongs, Rubin has lost in excess of one million dollars, which he seeks to recover here.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs; and venue is proper under 18 U.S.C. § 1391 because a significant portion of the acts and transactions that give rise to these claims took place here.

## PARTIES

4.     Plaintiff Michael Rubin is a citizen and resident of New York.  Michael Rubin Associates, L.L.C. ("MRA") is a limited liability company formed under the laws of the State of Connecticut with its principal place of business in New York, New York.

5.     James H. Amos, Jr. ("Amos"), a citizen and resident of Tennessee, is the Chairman and Chief Executive Officer and, upon information and belief, a principal owner of SLC.  Amos became chairman of SLC in approximately March 2004 when he, together with Carousel Capital, bought a substantial ownership interest in the company. Amos is subject to jurisdiction in this District by reason of his offering and selling franchises to residents of this state.

6.     Heather Rose ("Rose"), a citizen and resident of Tennessee, is Chief Operating Officer of SLC, and has held that position since approximately April 2004. Rose is subject to jurisdiction in this District by reason of having offered and sold franchises to residents of this state.

7.      Dennis R. Jones ("D. Jones") is the founder and President of SLC.  He is a citizen and resident of Virginia.  He is subject to jurisdiction here by reason of having offered and sold franchises to residents of this state.

8.      Cookie Jones ("C. Jones") is a former officer of SLC.  She is a citizen and resident of Virginia and subject to jurisdiction here by reason of having offered and sold franchises to residents of this state.

9.      Thomas R. Noon ("Noon") was Chief Financial Officer of SLC from 2002 until August 2004, and since September 2004 has been strategic projects officer.  He is subject to jurisdiction here by reason of having offered and sold franchises to residents of this state.

10.     Sona International Corporation ("SIC") is the parent of SLC and is, upon information and belief, a Virginia corporation with its principal place of business in Chesapeake, Virginia.   SIC is subject to jurisdiction here by reason of its having transacted business here and having offered and sold franchises to residents of this state.

11.     Carousel Capital ("Carousel") is an investment banking firm that, upon information and belief, is headquartered in Charlotte, North Carolina.  It is subject to jurisdiction here by reason of its being a control person of a franchisor who sold franchises unlawfully in New York and to New York residents.

12.     Sona Laser Centers, Inc. ("SLC"), is a Virginia corporation, with its principal place of business in Franklin, Tennessee.  SLC is the corporate franchisor of Sona Laser Centers and, later, Sona MedSpas.  SLC is subject to jurisdiction here because it has offered and sold franchises to residents of the state.

## BACKGROUND

13.    The market for enhancement of personal physical appearance is immense; it includes cosmetics, diets, plastic surgery, personal care products, tanning salons, teeth whitening treatments, manicures and hairstyling.   The removal of unwanted hair is a substantial part of this market.  Until recently, hair removal has been a lengthy, painful and usually futile process.   Methods such as shaving, tweezing, waxing, the use of chemicals or electrolysis produce results that may last for a few hours or a few weeks, but that leave the skin rough or sore.   Furthermore, these methods do not remove hair permanently either because (as with shaving), they simply cut the hair, or, if they remove it (as in tweezing or electrolysis) hair grows in cycles – that is, while existing hair may be removed, new hairs are being generated in other hair follicles.   Relative success can be achieved only by repeatedly treating an area and completely disabling or deadening all of the follicles over an extended period of time. Older methods of hair removal, such as electrolysis or waxing, that disable or tear out the follicles, do so only after either extremely time consuming processes or with great pain (*e.g.*, application of hot wax to sensitive areas, followed by stripping the wax off, the way a band-aid might be pulled of a young child's arm).

14.    Lasers, which generate high energy in the form of light, have the capacity to disable some hair follicles.  In lay terms, lasers kill the hair follicles by burning them up.   There are, however, a number of limitations inherent in the ability of lasers to remove hair.  First, because lasers use light to disable follicles, the hair must be able to absorb the light energy – that is, the light energy must be able to distinguish hair follicles from surrounding skin.   For this reason, laser hair removal works best on dark hair

growing in light skin.  Light hair, such as blonde, red, or gray hair, is "invisible" to the laser.  Similarly, dark hair on dark skin is difficult to remove with a laser.  Historically, these limitations on laser hair removal have restricted its growth in the marketplace, since competing technologies, such as waxing or electrolysis, can be used on any type of hair or skin.  Additionally, like other hair removal processes, laser hair removal does not work in a single treatment.  The skin must be treated repeatedly over a period of months so that hair in all of the growth cycles is removed.

15.    Despite the hurdles inherent in laser technology, lasers have enjoyed a certain measure of success for hair removal.  The technology, moreover, can be used to "rejuvenate" skin; that is, the laser energy can destroy certain unwanted features, such as spider veins; it can eliminate discolorations; it can kill bacteria, such as acne bacteria, and it can instigate the growth of new collagen.

16.    There are currently many venues for laser hair removal or skin rejuvenation.  Some of these are independently-operated hair removal or skin treatment centers; some are adjuncts to practices of physicians such as dermatologists or plastic surgeons; some are operated as adjuncts to spas where guests receive an array of personalized treatments, such as massages, facials or mud packs.   There are, moreover, many different laser manufacturers who compete to supply outlets such as Sona Laser Centers.  The pace of technological advance is very rapid, and any provider of cosmetic lasers services must have current equipment in order to maintain its competitive position.

## SLC ENTERS THE MARKETPLACE

17.     Beginning in the late 1990s, Dennis Jones and Cookie Jones founded a Sona Laser Center in Chesapeake, Virginia for the removal of hair by laser treatment. The Joneses made the center similar to a spa as opposed to a doctor's office, with an emphasis on comfortable surroundings and a soothing environment.  The Joneses used a brand of laser manufactured by a company called Cynosure.  They then licensed the concept to a number of other operators.  By the middle of 2002, the Joneses decided to franchise the concept through SLC, and prepared a Uniform Franchise Offering Circular – a document similar to a prospectus that is required by law to be provided to prospective franchisees – promotional materials, and a Web site.

18.     The Joneses had a vision for Sona that went beyond mere franchising. Instead of selling the rights to one Sona Laser Center at a time, they embarked on a program to sell the rights to develop Sona Laser Centers in large geographic territories -- such as a major metropolitan area (e.g., Phoenix/Scottsdale; Cleveland; Pittsburgh) -- to a single developer.  That developer would then have the obligation to develop that market by building several Sona Laser Centers over the period of the development agreement.

19.     The franchisor, SLC, was bound by law to make disclosures to prospective franchisees consistent with the requirements of the FTC Rule on Franchising, 16 CFR Part 436 and the Uniform Franchise Offering Circular Guidelines. In addition, once a developer executed an agreement to purchase a territory, SLC was bound to make full disclosure to that developer, by providing a disclosure document, in connection with each franchise that the developer then developed.

20.     Each of the Joneses, Noon, Amos, Rose and Carousel were "control persons" of SLC and, as such, were bound by law and by industry practice in the franchising industry to make the same level of disclosure to prospective franchisees as SLC -- *i.e.*, in accordance with the standards of the Uniform Franchise Offering Circular Guidelines.

## DEFENDANTS' REPRESENTATIONS TO PLAINTIFFS

21.     In 2002, Michael Rubin began investigating franchise opportunities, and became interested in "med spas" – centers that offered health and wellness services; he was attracted to them because the field was new and was not crowded.  He discovered Sona Laser Centers and in the Spring of 2003 called Thomas Noon.

22.     Michael and his wife scheduled a visit with Sona at its headquarters in Chesapeake, Virginia, in July 2003; at that time, they met with the founder of Sona, Dennis Jones and his wife Cookie Jones.  During that meeting, the Joneses, on behalf of Sona International and Sona Laser Centers Inc., made numerous oral representations which were then supplemented by written materials or materials on various Web sites.

23.     The representations that SLC and the Joneses made included the following:

(a) SLC had developed a proven business model for removal of unwanted hair through laser technology and had the "fastest, most powerful laser technology and offered services at much lower fees than competitors."  (Ex.1.)

(b) A Sona franchise could be operated by a franchisee with no prior experience in the field.

(c) SLC had a patent-pending "revolutionary" concept, that removed 97 percent of hair in all  body areas permanently in an average of five treatments.  The Jones Defendants further represented that this

patent-pending process resulted in hair removal in "less time with better results" and that ensured that franchisees had "a compelling competitive advantage."  (Exs. 1, 2, 3.)

(d) SLC's success was based largely on its use of the best, state-of-the-art lasers, which were manufactured by Cynosure, specifically for use by Sona franchisees.  Moreover, SLC provided "continuous maintenance and replacements to keep each center a step ahead of the competition."  (Ex. 7.)

(e) In addition to the best lasers, Sona's patent-pending concept enabled it to treat unwanted hair at precisely the right times in the hair growth cycle in order to be effective.  No one else had this proprietary treatment protocol.

(f) Sona had a topical anesthetic called "Sonacaine" that minimized any discomfort from treatment.

(g) While other laser hair removal services could not treat blonde, red or gray hair, SLC franchisees had an "exclusive license" for a product called "Meladine" that made light colored hair follicles "visible" to lasers, and that "enables all hair colors to be treated." (Ex. 4.)  This exclusive product, <u>proven to be effective in clinical studies</u>, alone would make Sona Laser Centers far more competitive than other laser treatment venues and would increase revenues substantially.

(h) SLC operated at a 55 percent gross profit margin or more (Ex. 5) and achieved break-even with revenues of $44,000 to $50,000 per month.  Noon provided Rubin with a franchise offering circular that showed pro formas reflecting financial results at assumed revenue levels ranging from $50,000 per month to $125,000 per month. Earnings ranged from $288 to $36,240.  The same offering circular stated that average monthly revenues were over $65,000; and that at this level, earnings would be $6,768 per month.  (Ex. 6.)

(i) SLC had "television, radio and print media materials … unsurpassed in the industry" that were worth "hundreds of thousands of dollars" and that were made available to the new Sona franchisees, not only for the grand opening, but also for "the ongoing success of the center."  SLC would provide hundreds of thousands of dollars in new additional advertising each year as part of base franchise fee (Exs. 7, 8, ) in addition, SLC had a "corporate marketing director" and "marketing staff."  A grand opening event would be planned and executed by SLC that would included press releases, media packages, radio and television appearances, and

an "all out media blitz."  Jones told Rubin that with this advertising, his phone would be "ringing off the hook."

(j) SLC provided world-class, state-of-the-art training "that goes far beyond standard industry practices" so that even franchisees who had no prior experience with the market would be fully trained and able to run their businesses.  (Ex. 9.)  "There is no more in-depth training to be found."  (Ex. 7.)

(k) SLC had custom-designed "world class" software that would facilitate operation of multiple centers including scheduling appointments and managing cash.  (Ex. 10.)

(l) The franchise was a "turn-key" operation; that is, SLC delivered a center to the franchisee that was ready to operate, requiring only minimal preparation on the part of franchisees.  (Ex. 11.)

(m) Each franchisee would have a dedicated account executive at headquarters who would resolve and be available to assist in resolving any problems or issues.  (Ex. 11.)

## PLAINTIFFS' RELIANCE

24.    In reliance upon the representations made by SLC, Sona International, Dennis and Cookie Jones, and Thomas Noon, Michael Rubin decided to purchase the rights to become the area developer of Sona Laser Centers in the Hartford and New Haven, Connecticut markets, and used MRA as a vehicle for that investment.  SLC furnished MRA with a Development Agreement, which MRA signed in September 2003, pursuant to which it agreed to develop at least 3 centers and to pay at least the following fees:

A.  A franchise fee for each center of $39,500;

B.  An area development fee of $10,000 for each center to be developed in the area (such amount to be credited to franchise fees when the center was opened);

C.  A training and set up fee for the first franchise $75,000 with additional fees for further centers;

D.  A fee for advertising materials of $12,500; and

E.  A software management systems fee of $25,000.

25.     In addition, SLC required, and MRA agreed to pay monthly, 27.5 percent of its gross revenues on laser services to SLC.  Other fees were paid for advertising, audits, transfer of the franchise and other services or events.

26.     SLC further required, and MRA signed a franchise agreement in September 2003 (the "2003 Franchise Agreement") with SLC pursuant to which MRA undertook to open a Sona Laser in New Haven, Connecticut, and  SLC agreed to provide certain guidance and assistance in connection with the operation of the franchise.  In particular, SLC agreed before the franchise opened, to provide:

(a) Training and set-up services, software management systems, advertisements, furniture and fixtures, office equipment and software, medical supplies and other supplies and equipment for opening the center;

(b) Sufficient training for the owner and up to four other individuals that would be adequate for them to open and operate the center, together with a set of manuals that would enable owners to operate the business;

(c) Assistance with site selection and lease negotiation;

(d) Advice on construction, set up and opening, organizing the business;

(e) Assistance with determining and assessing the local demographics and hiring staff and a medical director;

(f) Assistance with the installing of equipment;

27.     In addition, SLC agreed, during the operation of the business, to provide:

(a) Reviews and analyses of the operations of the individual franchisee;

(b) Improvements in administrative bookkeeping, accounting, inventory control, and general operating procedures;

(c) Updates to manuals to incorporate improvements and new developments;

(d) Periodic telephone and electronic mail assistance on daily operations, marketing, advertising, financial management, personnel and other operating issues;

(e) Review of proposed equipment, supplies and service contracts to see if they met the specifications of the Sona system; and

(f) Administration of a system-wide advertising and promotional fund; and

(g) Assistance with laser equipment, servicing, maintenance and repairs.

28.    In further reliance upon the representations that had been made to MRA, Michael Rubin contacted SLC and requested information about the amount of space that would be needed for the laser center.  Both Tom Noon and Steve Duncan, SLC's new vice president of real estate, told Rubin that he should obtain sufficient space for a "mega center"—a Sona Center that was almost twice the side of standard centers, in order to meet the demand, and that 5000 square feet would be required.  Rubin questioned whether he would need this much space and was told that it would be necessary.  Rubin went forward and located such space and began to build it out.  Although he was told that it should cost him approximately $100,000 to build out this space after standard landlord's concessions, the actual expense came closer to $260,000 after such concessions.  Rubin complained about these cost overruns to Heather Rose, and she responded that the overruns were Rubin's fault.

29.    In anticipation of opening, Rubin asked SLC who it should use as an advertising agency.  Kurt Schusterman, SLC's marketing vice president recommended Fletcher Martin Ewing, any agency in Atlanta.  Rubin met with Fletcher Martin Ewing ("FME") and hired them.  They developed a marketing and advertising plan that cost $70,000 for the first six weeks.

30.     MRA opened its first Sona Laser Center in New Haven, Connecticut on November 15, 2004.  Within three weeks, FME had spent the entire advertising budget.

## THE FALSITY OF DEFENDANTS' REPRESENTATIONS

31.     Unknown to MRA until the Spring of 2005, when it finally began to discover the truth, the representations that Defendants had made to it about the Sona franchise were false.  In particular:

(a) The Sona hair removal concept was not a proven concept, and the Sona business model was not a proven business model.  In fact, Sona's own centers did not achieve the results that Defendants were promising for MRA's centers.

(b) Far from being a franchise that could be operated by a franchisee with no prior experience, in Connecticut, where MRA was to open its centers, it was necessary to have an on-staff physician—an substantial expense that was not fully disclosed, and a departure from the business "model" that made the cost of operating a Sona center much higher for MRA than other franchisees.

(c) SLC's pending "patent" was useless.  Its lasers did not remove 97 percent of hair in an average of five treatments; in fact, nurses from SLC's own company-owned centers admitted that the Sona technology removed only about 70 percent of unwanted hair. There was no competitive advantage.

(d) The lasers that Sona had MRA use, manufactured by Cynosure, were not state-of-the-art lasers, were not exclusive to Sona franchisees, were not the best available on the market and were not continually maintained.  In fact, unknown to Rubin and MRA, Cynosure had an equity interest in SLC, and Cynosure lasers were used because of the financial benefit such use provided to Cynosure.

(e) The SLC pending patent and "proprietary" treatment schedules were based on decades old research and standard practice in the hair removal industry.  As described below, Sona's lasers were also ineffective to remove hair that was blonde, red or grey, or to remove dark hair on dark skin.  Indeed, even under the best conditions of dark hair and light colored skin, more than five treatments were usually required.  In fact, Sona's own internal information showed that on most areas of the body, 7 to 12 treatments were required.  Dr. George Wilson, Sona's national

medical director, had in fact generated an internal analysis that confirmed this fact.

(f) "Sonacaine" was ineffective to relieve pain during treatment for a large portion of clients, and many clients were lost as a result.

(g) Meladine did not make blonde, gray or red hair susceptible to laser treatment; instead, it was simply not effective, as admitted by Sona's own training nurses.  Additionally, it was not exclusive or proprietary; SLC sold it to non-Sona Laser operators.  In fact, both Meladine and Sonacaine were manufactured by a separate company owned and operated by Dennis Jones, who used the franchisees as captive customers, forcing them to buy his products and not permitting the use or resale of competing, more effective products, and thus abusing the franchisor's leverage over franchisees.

(h) The representations that Sona Laser Centers operated at a 55 percent margin and reached break-even at revenue levels of $50,000 per month with 55% profit beyond this revenue level were false.  The company-owned Sona Laser Centers in operation at the time of the offering did not achieve the earnings levels purported by Sona.  Also, the earnings claims in the offering circular were highly deceptive and premised upon a deliberate distortion and disregard of generally accepted accounting principles and disregard of the franchisees' obligations.  The "margin," "break even" and earnings claims were based on recognizing all cash received in advance for treatments as revenue, without accounting for the cost of providing continuing services.  For example, if a customer paid $1,000 in January for five treatments to be delivered over the course of the following year, SLC treated the full $1,000 as income earned in January, but accounted only for the expense of services rendered in January (*e.g.*, one treatment) in calculating the "margin." Generally accepted accounting principles require that only the portion of the fee attributable to the services rendered in January – *e.g.*, $200 for one treatment – be recognized as income. Defendants, however, presented their earnings claims without disclosure of these facts.  The result was that cash flow margins and profits were grossly overstated.

(i) The advertising materials that SLC produced and made available to MRA were useless; the "marketing director" and marketing departments were incompetent, and there was no grand opening event or materials.  In fact, the materials furnished were amateurish and unsuitable for use by MRA, which had to create its own advertising materials at immense expense.

(j)  The training that SLC provided to MRA was on an amateur level; trainers were not familiar with how to operate laser centers, to operate equipment, or to answer questions.

(k)  The software provided and installed by SLC not only was inadequate to assist MRA in operating its businesses, but was in fact counterproductive.  The software crashed, with the result that MRA lost virtually all its records, including names, addresses and telephone numbers of all its clients and treatment dates for clients. SLC admitted that the crash was the result of its faulty installation.

(l)  The Sona business was not a turnkey operation.  Rather, because the training and support was so lacking, it required constant supervision and attention by owners.

(m) SLC was incapable of providing meaningful or sustained support for franchisees and, instead, left them on their own.  For example, SLC had no guidance for MRA with respect to its staff physician or how to adjust the business model to account for a staff physician.

As noted, however, MRA did not know, and had no way of knowing, the falsity of these representations at the time it bought is franchise or built it out.

## **AMOS TAKES OVER**

32.    In or about March 2004, before MRA and Rubin had opened their New Haven center, Amos, together with Carousel, purchased a substantial interest in SLC or SIC.  Amos became chairman, and installed his daughter, Heather Rose, as COO. Dennis Jones and Thomas Noon continued as executive officers of SLC.

33.    On or about March 27th or 29, 2004, SLC hosted a conference of franchisees at which Amos was introduced as the new Chairman of SLC and representatives of Carousel were introduced as substantial investors.  Amos and Carousel announced to the assembled franchisees, including Rubin, that Amos was the former CEO of Mailboxes, Etc., former Chairman of the International Franchise Association, a man of high ethical standards and an executive of proven leadership

ability.  Under Amos, SLC was going to grow very rapidly; SLC would provide franchisees with national advertising support; the methods that Amos had used to grow Mailboxes, Etc. would be used for Sona, and Sona would become a "household name;" within a short period of time, the company would make a public offering of its stock. Carousel was portrayed as a substantial investment bank with deep experience in franchising because it was a large equity owner of Meineke Discount Mufflers.

34.   The Franchisees, including Rubin, viewed the arrival of Amos and Carousel as a strong positive development that positioned the Sona concept for immense, long-term growth.

35.   Upon taking over SLC and SIC, SLC, Amos, Rose and Carousel, together with Dennis Jones and Noon, continued to market and sell franchises for Sona Laser Centers with the same representations that had been made to Rubin and MRA.

36.   Shortly after Amos's takeover, but well before MRA had begun to invest in building out its location in New Haven, franchisees who had already opened their centers began to notice discrepancies between the actual performance of their franchises and what they had been told.  In particular, the marketing materials that had been promised to them were not useable, and some franchisees had to develop their own materials; franchisees were having difficulty removing 97 percent of clients' hair in five treatments; Meladine was not working so as to make blonde, red or grey hair susceptible to treatment.  Most significantly, most franchisees were not achieving the financial results that they had been told:  instead of realizing margins of 55 percent, they were incurring immense liabilities.

37.    These franchisees repeatedly called these shortcomings to the attention of Amos, Rose and Carousel, such that, by June 2004 Amos, Rose and Carousel knew that the representations that had been made to MRA and every other franchisee had been false, and that there was no way that a Sona Laser Center, as sold to the franchisees, would perform in the way it had been represented.  Nonetheless, SLC, Amos, Rose and Carousel embarked upon a program to deny, obfuscate and conceal the truth about the Sona technology, the Sona financial model and the Sona franchise. As a result, Rubin and MRA continued to invest in and work on the Sona Laser Center in New Haven through the summer and fall of 2004, even though SLC, Amos, Rose and Carousel knew or should have known that it had been misrepresented to Rubin and MRA and they were under a duty to disclose the truth to them.

38.    The duty that Defendants had to make complete disclosure of the truth of the Sona system, technology and franchise to Rubin and MRA arose, first, from their positions as control persons of the franchisor; second, from the fact that they had knowledge superior to that of the franchisees, and knew that Sona had misrepresented the franchise system to the franchisees.  Third, Amos in particular had held himself out as being an exceptionally honest and ethical person, and publicly undertook to adhere to the highest ethical standards, which standards would require him to immediately disclose to the franchisees the truth of the Sona system.  In violation of all of these obligations, Amos, Rose and Carousel deliberately suppressed the truth for their own personal gain, knowing that it would severely damage the franchisees, including MRA.

## SLC LAUNCHES SONA MEDSPA

39.     In pursuit of their scheme and conspiracy to cover up the truth about the Sona franchise, Amos, assisted by Rose, Dennis Jones, Noon, and Carousel, continued to sell franchises on the same basis as before and continued to repeat those false representations on their website, on other websites, in person and in written literature.

40.     In the fall of 2004, to rebuff the growing chorus of complaints from franchisees, including MRA, and to further obfuscate and conceal the fraud they had committed and continued to commit, Amos, Rose, and Carousel announced to the franchisees that they were launching a new concept, "Sona MedSpa," that would replace the Sona Laser Center concept and that would offer skin rejuvenation in addition to hair removal.  The "MedSpa" concept included, in addition to removal of unwanted hair, treatment by laser of aging skin and wrinkles.  In order to induce MRA and other SLC franchisees to remain with the Sona system, and to further suppress the truth, SLC, SIC, Amos and Rose, with Carousel's knowledge and financial backing, made a series of further representations that later proved to be false:  (a) laser skin rejuvenation was more than twice as lucrative as laser hair removal and would generate fees of $800/hour per laser; (b) Sona had achieved performance levels that would prove out these projections; (c) the technology available from Cynosure was appropriate for these purposes; (d) if franchisees invested in new equipment, they would realize the financial rewards that skin rejuvenation promised.  SLC, SIC, Amos, Rose and Carousel made these representations knowing that they were false, in order to conceal the truth and to induce MRA and other franchisees not to leave the Sona system and to invest further in it.

41.     In reliance upon these representations, and believing them to be true, believing Amos, Rose and Carousel in their claims that they intended to rectify the mounting problems and shortcomings in the Sona system, MRA opened its laser center in New Haven, Connecticut on November 15, 2004.  MRA then launched the $70,000 advertising campaign for which it had contracted with FME.

42.     To cap off the launch of Sona Med Spas, on or about January 6, 2005, SLC sent all existing franchisees, including MRA, a new purported "Offering Circular" describing the new "Sona MedSpa" franchise.  In conjunction with this offering, the Defendants announced that developers, such as MRA, would only be able to fulfill their development obligations to open new franchises by doing so under the new "Med Spa" franchise agreement.  That agreement raised franchise fees by $10,000; it doubled the capital requirements; it deleted any obligation of the franchisor to the franchisees; it required franchisees to hire the franchisor's advertising agency for local advertising and was otherwise significantly more onerous than the old agreements.

43.     Although SLC offered these new franchises to all existing Sona franchisees, SLC did not register these franchise offerings with any state, as is required. Additionally, the form of the offering circular that SLC sent to franchisees failed to conform to the requirements of law in at least the following respects:  (a) the cover page is incorrect and incomplete; (b) the description of the fees to be paid by the franchisee is incomplete and the notes to this section, in part, are unintelligible; (c) the description of the franchisor's obligations does not correlate with the franchise agreement; (d) no agreement is included for the acquisition of laser equipment so that prospective franchisees may be fully informed of the costs and liabilities they will incur for this

expensive equipment; (e) the financial statements are outdated and incomplete; (f) the earnings claims (item 19) are incomplete, incorrect and in violation of law; (g) the offering circular states, in substance, that neither SLC nor its officers or executives had been involved in any material litigation involving claims of franchise fraud.

44.     Rubin expressed doubts about the new offering circular and the related agreement to Amos and Rose, but they told him that:  (a) it was entirely lawful; (b) if MRA wanted to reduce its ongoing expenses, it had to sign the new agreement, which would replace the old agreement; (c) SLC would no longer support the "Sona Laser Center" model, so signing up on the Med Spa agreement was the only way to receive continuing support; (d) most of the franchisees had agreed to sign the new agreement. Believing these representations to be true and in reliance upon them and on the omissions of defendants, Rubin executed the new form of franchise agreement on February 15, 2005 (the "2005 Franchise Agreement").

45.     Finally, in the Spring of 2005, MRA and Rubin began to discover on their own that the Sona business was a fraud.  In addition to the fraudulent aspects of the system set forth above, MRA discovered the following:

> (a) Because of the complete lack of proprietary technology, ability to treat all types of hair, or to remove hair in five treatments, the Sona system could not be marketed on a competitive basis.

> (b) Because customers had purchased "packages" consisting of a number of treatments on the basis of the representations that Sona had made, MRA built up substantial liabilities to clients, either in the form of providing continuing treatments to those who demanded that 97 percent of their hair be removed, or in the form of refunds because the hair had not been removed in five treatments as promised.

> (c) Because of the lack of advertising and support from the franchisor and Defendants, as well as the lack of any ability to compete, MRA

was unable to remotely meet the profitability levels that Sona had characterized as typical.

(d) Because the economic model that Sona had described to MRA did not account for the liabilities of providing continuing treatments (and completely ignored liability for any treatments beyond five) MRA encountered increasing liability as time went on.

(e) The representations about Sona's ability to treat and rejuvenate skin were false.

(f) Despite MRA's expenditure of $70,000 for advertising, the campaign was short-lived (*i.e.¸* three weeks) and ineffective.  MRA then discovered that while SLC had been recommending FME as the advertising agency for him to use, SLC had been planning to replace it with another agency because of its shortcomings.

(g) As already noted, the cost of building out the center in New Haven was far in excess of what SLC had told MRA; in addition, the actual space required for the center was not the 5,000 square feet that SLC had told Rubin, but was in fact only 3,800 square feet.  As a result, MRA had to pay rent far in excess of what was necessary.

(h) Amos had been a defendant in a number of lawsuits alleging that he had engaged in franchise or securities fraud, which litigation was material and should have been disclosed in the offering circular.

As a result of the Defendants' fraud, misrepresentations, fraudulent omissions and failures to fulfill their obligations, MRA has lost in excess of one million dollars.

## **Invalidity of the Arbitration Clauses**

46.    The 2005 Franchise Agreement contains an arbitration clause that purports to apply to disputes between MRA and its principals on the one hand and SLC, its affiliates and principals on the other.  That arbitration clause is invalid or otherwise not enforceable because:

(a)     The parties failed to reach an agreement to arbitrate all disputes; the offering circular that accompanied the 2005 Franchise Agreement contains an addendum for New York residents that states, in substance, that nothing in the

arbitration provisions of the franchise agreement will deprive the franchisee of its rights under the New York State Franchise Sales Act.  Among the franchisee's rights under the Franchise Sales Act is the right to obtain redress in court.

(b)    The arbitration provisions were induced by fraud, including in particular, Defendants' assertions that the offering circular and 2005 franchise agreement were legal when, in fact, they were not; Defendants' omissions in the offering circular of their intentions to rely on pre-emptive arbitration; given the full disclosure requirements for offering circulars, the Defendants' failure to explain the presence and full implication of the arbitration clause.

(c)    The 2005 Franchise Agreement is subject to rescission on account of Defendants' fraud and violations of the New York Franchise Sales Act.

47.    The 2003 Franchise Agreement contains an arbitration clause that purports to apply only to disputes between MRA and SLC;  That arbitration clause is invalid or otherwise not enforceable because:

(a)    The parties failed to reach an agreement to arbitrate all disputes; the offering circular that accompanied the 2003 Franchise Agreement contains an addendum for New York residents that states, in substance, that nothing in the arbitration provisions of the franchise agreement will deprive the franchisee of its rights under the New York State Franchise Sales Act.  Among the franchisee's rights under the Franchise Sales Act is the right to obtain judicial redress in court.

(b)    The arbitration provisions were induced by fraud, including in particular, Defendants' omissions in the offering circular of their intentions to rely on pre-emptive

arbitration; given the full disclosure requirements for offering circulars, the Defendants' failure to explain the presence and full implication of the arbitration clause.

(c)     The 2003 Franchise Agreement is subject to rescission on account of Defendants' fraud and violations of the New York Franchise Sales Act.

**COUNT ONE**
**(Violation of the New York Franchise Sales Act)**

48.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

49.     The New York Franchise Sales Act applies to the sale by Defendants to Rubin and MRA of the Sona Laser Center franchises because SLC directed its franchise offerings to Rubin and MRA in New York.   Under the New York Act, it is unlawful for any person, in connection with the offer, sale or purchase of any franchise, to directly or indirectly (a) employ any device, scheme or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact; or (c) engage in any act, practice or course of dealing that operates or would operate as a fraud or deceit upon any person.

50.     It is also unlawful for any person to offer or sell a franchise subject to the New York State Franchise Sales Act without registering with the State, and providing to the offeree a prospectus that conforms to the requirements of the Uniform Franchise Offering Circular Guidelines.

51.     In connection with the initial offer and sale of the New Haven SLC franchise to MRA, franchisees, SLC, SIC, Noon, and the Joneses made misrepresentations of material facts and omissions of material fact, as set forth above.

25

52.     In connection with the offer and sale of the "Sona Med Spa" franchise to MRA, SLC, SIC, Amos, Rose, and the Joneses violated the New York Franchise Sales Act by:

(a)     Making misrepresentations of material facts and omissions of material fact, as set forth above;

(b)     Failing to register the franchise offering circular with the State of New York, as required by law;

(c)     Failing to provide a prospectus to MRA and Rubin that conformed to the Uniform Franchise Offering Circular Guidelines.

53.     The New York State Franchise Sales Act provides that each person who directly or indirectly controls a person liable under the act; and each principal officer or director of a corporation liable under the act; each employee who materially aids in the violation shall be equally liable with the franchisor under the Franchise Sales Act.

54.     Separate and apart from their primary liability for violation of the New York State Franchise Sales Act, Carousel is liable under the New York Act as a control person of SLC; the Joneses, Noon, Amos and Rose are liable under the New York Act as principal officers of SLC.

55.     If Defendants had not made the misrepresentations of fact, omissions and artifices to defraud, as set forth above, MRA would not have purchased franchises for Sona Laser Centers and would not have incurred the losses that it has now sustained. Plaintiffs are entitled to rescind their franchise purchases and to recover restitution from Defendants, plus costs and attorneys fees.

**COUNT TWO**
**(Violation of the Connecticut Unfair Trade Practices Act)**

56.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

57.     The Connecticut Unfair Trade Practices Act (CUTPA) provides that it is unlawful for any person to engage in deceptive acts or practices in connection with any trade or business.   CUTPA further provides in substance that the regulations and decisions under the Federal Trade Commission Act shall be treated as precedent in construing CUTPA's broad prohibition on unfair trade practices.  Pursuant to CUTPA, the FTC Rule on Franchising, 16 CFR Part 436, requires that a franchisor, in selling a franchise to a prospective franchisee, shall provide a prospectus that conforms to the requirements of the Uniform Franchise Offering Circular and shall not make any misleading statement or omission in connection with the offer or sale.

58.     Defendants violated CUTPA by providing Rubin and MRA with the first and second offering circulars for the Sona Laser Center franchise, which contained false statements of material fact and omissions of material fact, and that otherwise failed to conform to the UFOC Guidelines, as set forth in detail above.

59.     Defendants made their false statements and provided the misleading offering circulars with the intent that MRA and Rubin rely upon them and, in so relying, purchase franchises for Sona Laser Centers.

60.     MRA and Rubin in fact relied upon Defendants' wrongful UFOCs, false statements and omissions in deciding to purchase the Sona franchises, and sustained damages as a result.

61.     MRA and Rubin are entitled to recover the damages sustained by them as a result of Defendants' violations of CUTPA, plus costs and attorneys fees.   Under CUTPA, MRA and Rubin are entitled to treble damages.

**COUNT THREE**
**(Common Law Fraud)**

62.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

63.     Defendants made material misrepresentations of fact, material omissions of fact, and engaged in deceptive acts and practices, as set forth above, in connection with and in order to induce the sale of the Sona franchise to Rubin and MRA and in order to induce MRA to remain as a Sona franchisee and to continue to invest in it and fund its losses.   To summarize defendants' wrongdoing:

(a)     SLC, SIC the Joneses and Noon misrepresented the franchise offering and the characteristics of the Sona technology and capabilities to Rubin in order to induce MRA to purchase the franchise and development territory and continued to suppress the truth after MRA had purchased.

(b)     Defendants misrepresented the characteristics and capabilities of the Sona "Med Spa" franchise; engaged in the unlawful offer of that franchise and both failed to disclose the truth, when they had a duty to do so, and actively suppressed the truth about the characteristics and capabilities of the Sona franchise and technology so that MLA would continue and would open its center in New Haven, Connecticut.

(c)     Amos, Rose and Carousel made an unregistered and unlawful offer of the Med Spa franchise to MRA and further misrepresented that it was lawful and that most franchisees had signed it, when they had not.

28

64.     These Defendants knew that their representations, omissions, suppressions and deceptive acts were false; they engaged in this deceptive activity knowing that their words and actions were false and misleading; and with the intent that MRA rely upon it, that it purchase the area development rights to Connecticut; and that it execute the Med Spa franchise agreement.

65.     Rubin and MRA reasonably relied upon these defendants' representations, omissions, suppressions and other deceptive acts in deciding to purchase the development rights and franchise for Sona; in paying hundreds of thousands of dollars in fees to SLC; in investing hundreds of thousands of dollars for real estate, equipment, supplies, training, promotion, advertising and employees; and in expending hundreds of thousands of dollars continuing to operate a system that was fundamentally non-functional.

66.     Defendants SLC, SIC, Amos, Rose, Noon, Dennis and Cookie Jones made continuing misrepresentations throughout the summer and fall of 2004, by, among other things, denying that there were any problems with the Sona franchise or concept, and blaming the problems on MRA and other franchisees.

67.     These Defendants' representations were false, and as a result of MRA's reliance upon Defendants' representations, MRA is entitled to rescind both franchise agreements that it entered into and recover damages, and hereby tenders the consideration, if any, it received from Defendants for the franchise.

68.     Defendants acted intentionally, with deliberate disregard of the rights of MRA and Rubin, with the knowledge that their fraud would severely injure the

franchisees while it enriched them.  Defendants' acts were reprehensible and egregious, to the extent that they should shock the conscience of the Court.

69.     MRA is entitled to rescind the agreements, and to recover rescission damages in excess of one million dollars, plus punitive damages in excess of $10 million or such amount as shall be sufficient to deter such conduct in the future.

**COUNT FOUR**
**(Negligent Misrepresentation)**

70.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

71.     Defendants had a business relationship with plaintiffs such that they were required, in conscience and good faith, to take due care to ensure that the information communicated to plaintiffs was truthful, accurate and reliable, and did not omit any material information.

72.     Plaintiffs relied upon the information furnished by Defendants in the belief that it was truthful and reliable, in deciding to purchase, invest in and operate a Sona Laser Center.

73.     Defendants failed to exercise reasonable care in the information that they provided to Plaintiffs and in fact unreasonably provided plaintiffs with unreliable and misleading information, which plaintiff relied upon to its detriment.

74.     As a result of plaintiffs' reasonable reliance upon defendants' misleading information, plaintiffs have sustained damages of no less than one million dollars.

## COUNT FIVE
### (Breach of Contract)

75.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

76.     SLC breached its contractual obligations to MRA by failing and refusing to provide pre-opening and post-opening support to MRA as set forth above.

77.     MRA is entitled to recover the damages it has sustained by reason of SLC's breaches of contract.

## COUNT SIX
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

79.     There is implied in every contract a covenant of good faith and fair dealing pursuant to which neither party will deprive the other of the fruits of the contract.   As between SLC and MRA, there was an implied covenant that SLC would make reasonable efforts, as spelled out in the franchise agreement and elsewhere, to support MRA and to be forthright and honest with it in all of its dealings with MRA.

80.     SLC has violated the implied covenant of good faith and fair dealing by failing to provide pre-opening and post-opening support to MRA; failing to provide full and accurate disclosure to MRA; and making misleading statements to MRA.

81.     MRA is entitled to recover the damages it has sustained as a result of SLC's violation of the implied covenant of good faith and fair dealing.

## COUNT SEVEN
## (Civil Conspiracy)

82.     Plaintiffs repeat and reallege each and every prior paragraph of this Complaint as though set forth here in full.

83.     Defendants Amos, Rose, Carousel, the Joneses and Noon, when confronted with the complaints of franchisees about the Sona technology and system in the spring of 2004, embarked upon and engaged in an unlawful civil conspiracy, in that they agreed amongst themselves unlawfully to suppress the truth with respect to Sona Laser Center Franchises and the efficacy of Sona treatments.  They carried out this conspiracy by falsely denying that there were any problems with the Sona system; by blaming problems on the franchisees; by undertaking to launch the "Sona Med Spa" system and issuing an unlawful and unregistered offering circular as a cover-up for the grave deficiencies of the Sona Laser Center system.

84.     As a result of Defendants' conspiracy, MRA was prevented from learning the truth when it should have, in the Spring of 2004, when it could have ceased investing in the Sona system; and because of the conspiracy, it continued to invest in, build and open its Sona franchise when, if defendants had not conspired and instead had disclosed the truth, it would have been able cease investing and reduce its losses.

85.     MRA is entitled to recover the damages it incurred as a result of defendants' conspiracy.

WHEREFORE, MRA and Rubin demand judgment as follows:

        a.     An award of its actual damages sustained, but in no event less than $1 million;

    b.    An award of punitive damages against each defendant of no less than $10 million;

    c.    An award of multiple damages under CUTPA;

    d.    An award of attorneys' fees;

    e.    Costs, disbursements and such other and further relief as the Court deems just and proper.

Plaintiffs demand a trial by jury.

Dated: July 8, 2005

DADY & GARNER, P.A.


By    /s/ W. Michael Garner
      W. Michael Garner (WG 3558)
230 Park Avenue
10th Floor
New York, New York  10169

And

4000 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
PH:  (612) 359-9000
FX:  (612) 359-3507

And

David Boies
BOIS SCHILLER & FLEXNER LLP
570 Lexington Avenue
16th Floor
New York, NY  10022
PH:  (212) 446-2300
FX:  (212) 446-2350

ATTORNEYS FOR PLAINTIFF

33